# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Emma Shuder,                                :
                          Petitioner        :
                                            :
               v.                           :
                                            :
Workers' Compensation Appeal                :
Board (Serenity Gardens Assisted            :
Living Community and Liberty                :
Insurance Corporation),                     :    No. 350 C.D. 2015
                          Respondents       :    Submitted: August 28, 2015


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE MARY HANNAH LEAVITT, Judge
           HONORABLE ANNE E. COVEY, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                              FILED: December 30, 2015


        Emma Shuder (Claimant) petitions this Court for review of the Workers'
Compensation (WC) Appeal Board's (Board) February 12, 2015 order affirming the
Workers' Compensation Judge's (WCJ) March 31, 2014 decision denying Claimant's
claim petition (Claim Petition).  The sole issue before the Court is whether the Board
erred in affirming the WCJ's denial of the Claim Petition.  After review, we affirm.

        On March 27, 2009, Claimant filed a Claim Petition alleging that she
sustained a work-related facial, dental, chest, neck, elbow, knee and back injury on
March 20, 2008, after falling when she tried to stay clear of an out-of-control vehicle
immediately outside her work building while in the course and scope of her
employment with Serenity Gardens Assisted Living Community (Employer).
Employer timely denied the allegations.

On March 31, 2014, the WCJ denied the Claim Petition after concluding that Claimant failed to prove that she sustained injuries caused by the condition of the premises or by operation of Employer's business thereon. The WCJ also determined that Claimant failed to establish that she sustained a disabling work-related injury. Claimant appealed to the Board. On February 12, 2015, the Board reversed the WCJ's conclusion that Claimant was not injured in the course and scope of her employment, but affirmed the WCJ's decision denying the Claim Petition. Claimant appealed to this Court.[1]

Claimant argues that the WCJ erred in denying her WC benefits because all medical experts agreed that Claimant sustained a work injury on March 20, 2008. Specifically, Claimant contends that since the WCJ's findings of fact 16, 21 and 25 were not supported by substantial evidence, the WCJ's decision was not reasoned.

This Court has held:

> 'Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party who prevailed before the factfinder. Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party.' It does not matter if there is evidence in the record supporting findings contrary to those made by the WCJ; the pertinent inquiry is whether the evidence supports the WCJ's findings.

*3D Trucking Co., Inc., v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007) (quoting *Waldameer Park, Inc. v.*

---

[1] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

*Worker' Comp. Appeal Bd. (Morrison),* 819 A.2d 164, 168 (Pa. Cmwlth. 2003) (citations omitted)).

Moreover, the law is well established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000). Thus, neither the Board nor the Court may reweigh the evidence or the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246 (Pa. 2001).

> Finding of fact 16 states:
>
> [] Claimant weighed 213 pounds on July 6, 2009 and her weight on June 9, 2005 was 287 pounds. She had a gastric procedure in approximately 2006. [] Claimant underwent a cervical laminectomy in 1997 and [Peter E.] McNeil[, M.D. (Dr. McNeil)] expressed his opinions based on examinations of studies done after the March 2008 injury, but did not consider any prior to that injury. The surgery that [] Claimant underwent in June of 2009 was a lumbar laminectomy with fusion. [] Claimant first had back complaints in April of 2005. [] Claimant had back pain in 2005 as a result of falling down steps twice and Dr. McNeil had x-rays of the lumbar spine and knees done and they reflected mild generalized degenerative change and no evidence of fracture or bone destruction. Dr. McNeil's testimony is found to be incredible because it is contrary to the credible and persuasive testimony of [David C.] Baker[, M.D. (Dr. Baker)].

WCJ Dec. at 3. Dr. McNeil testified as follows:

> Q. [Employer's Counsel] And during the time that you've been responsible for her care, what was [Claimant's] highest weight?

3

A. [Dr. McNeil]  **On October 7th of 2004 she was 282 pounds.  On June 9th of 2005, 287 pounds**.  And that appears to be the highest, in answer to your question.

Q.  And in between the highest weight you just told me about and the **present weight of 213**, did she have a surgical procedure to minimize the amount of food that she could metab[]olize, **a gastric procedure of any type**?

A.  **Yes**.

Q.  When was that?

A.  I'm reviewing my notes.  **Approximately 2006**.

Q.  And do you know what spinal stenosis and foraminal stenosis are?

A.  Yes.

Q.  And am I correct that whatever records were sent to me reflect that [Claimant] has a long history of stenosis of an orthopedic type?

A.  Yes.

Q.  And your records that were sent to me also include a note that **she had a cervical laminectomy in what, 2004 or 1999; do you know**?

A.  **I seem to recall 1997**.

. . . .

Q.  [Claimant] had a **lumbar laminectomy with fusion in June of '09**; is that correct?

A. **Yes**.

. . . .

Q.  . . . . What's your **earliest recollection of any lumbar back complaints** for [Claimant]?

A.  **April of 2005**.

Q.  Is that the earliest records you presently have concerning her care?

4

A. The earliest records I have in front of me go back to October 7th of 2004.

Q. Okay. And when you have **a note in 2005 with back complaints**, what does it say?

A. It says that she had low back pain. She was taking ibuprofen. **She fell down steps twice**. Her knees gave –

Q. Were there any **diagnostic studies performed at that time in 2005**?

A. I ordered **X-rays of her L-spine and her knees**.

Q. What did they reflect?

A. Lumbar spine showed **mild generalized degenerative change**, **no evidence of fracture or bone destruction**. . . .

Reproduced Record (R.R.) at 58-60, 62-63 (emphasis added). Clearly, finding of fact 16 is supported by substantial evidence.

Finding of fact 21 provides:

[Mahmood] Nasir[, M.D. (Dr. Nasir)] did not see any evidence of any cervical radiculopathy or cervical nerve root compression from the electro diagnostic studies. The electric diagnostic study [sic] do not correlate with [] Claimant's complaints. Dr. Nasir's testimony is found to be incredible because it is contrary to the credible and persuasive testimony of Dr. Baker and it is based upon an inconsistent history.

WCJ Dec. at 4. Dr. Nasir expressly opined as follows:

Q. [Employer's Counsel] In regard to the diagnostic testing that was done, you, yourself, performed the **electrodiagnostic studies**; is that correct?

A. Yes, that's correct.

Q. And you did studies on both the upper extremities and the lower extremities?

A. That's correct.

5

Q. In regard to the upper extremity testing, Doctor, **there was no evidence of any cervical radiculopathy, was there**?

A. **No.**

Q. **No evidence of any cervical nerve root compression** from an electrodiagnostic standpoint?

A. **No.**

. . . .

Q. **So that electrodiagnostic study does not correlate with her complaints**, does it?

A. It just rules in/rules out certain things. It's not like a foolproof test.

R.R. at 134, 135 (emphasis added). Consequently, finding of fact 21 is supported by substantial evidence.

Finding of fact 25 states:

Dr. Baker's physical examination revealed that [] Claimant did not have any signs of muscle wasting in her arms and did not have reflex asymmetry in the biceps, triceps, or brachioradialis. [] Claimant did not have any weakness in any myotomal muscle groups and most of the tests he performed on her were negative, except one did produce numbness in the median nerve distribution. [] Claimant had numerous trigger points around the neck, shoulder region, and trochanteric region of each hip. But there was no thigh or calf atrophy. The lower extremity reflexes were normal and her straight leg raising was negative. [] Claimant also had a valgus deformity to the right knee consistent with lateral compartment osteoarthritis and tenderness in the parapatellar tissue in each knee. **Dr. Baker was of the opinion that [] Claimant's symptoms** were the result of long standing bilateral degenerative joint disease, degenerative joint disease in her knees, and degenerative disc in her lumbar and cervical spine, and **are not causally related to the March 20, 2008 incident.** Dr. Baker's testimony is found to be credible because he performed [a] thorough physical examination and reviewed numerous diagnostic test results and medical records concerning []

6

Claimant's treatment and his objective findings are consistent with those of the physician's [sic] who examined [] Claimant in close proximity to the incident.

WCJ Dec. at 5. Dr. Baker specifically declared as follows:

Q. [Employer's Counsel] Did you exam [Claimant]?

A. Yes.

Q. What did you find?

A. She didn't have any deformity in her neck or either shoulder, arm circumference bilaterally.

Q. What's the significance of that, Doctor?

A. We do it routinely in the IREs. We measure arm and forearm circumference. **If someone with prolonged neurogenic findings -- will have asymmetric wasting of a group of muscles. So, she was -- did not have atrophy.** **She did not have reflex asymmetry in the biceps, triceps or brachioradialis**, including she did not have hyperactive reflexes, which you can get with myelopathy. You can pinch one nerve and often the reflex will diminish. If you pinch the whole cord, you get a different set of symptoms; and the reflexes can be hyperactive not absent.

**She did not have any focal weakness in any myotomal muscle group.** Spurling's test was negative, which is a provocative test. It's analogous to a straight leg raise test. It reproduces her arm pain. Hoffmann's sign was negative. Shoulder exam and elbow examination were both benign. Phalen's test on the left did reproduce numbness in the median nerve distribution. **She had multiple tender points around her neck, shoulder region, trochanteric region of each hip**. She had enough to meet the criteria for -- at least the 1991 criteria for fibromyalgia.

Q. Now, Doctor, let me go back and ask you some questions about the positive Phalen's test on the left. What kind of test is that, and what does it indicate?

A. . . . .

7

With respect to her low back, she had a well-healed midline incision. **She did not have thigh or calf atrophy**. She did not have reflex problems. There was not dermatomal altered sensations. **Straight leg raise test was negative**. **She had a valgus deformity to the right knee consistent with osteoarthritis in the lateral compartment**. She had tenderness in the parapatellar tissue in each knee. There was no ligament instability in either knee; and Waddell's tests were positive with pain on pseudo rotation of pelvis, pseudo compression of shoulders, stroking the skin on the low back or tapping the skin.

. . . .

Q. Doctor, taking into account your physical examination findings, the history you elicited from [Claimant] both directly and through review of reports and records, your review of all the diagnostic studies including the actual images, do you have an impression within a reasonable degree of medical certainty as to diagnoses in her case?

A. At this time when I saw her, the diagnosis for the neck pain -- it was neck pain with left arm pain with nonverifiable radiculopathy with radiographic high grade multilevel cervical stenosis without either radicular findings or myelopathic findings.

Q. Now, while you['re] on that diagnosis, Doctor, **is that diagnosis in any way causally related to the March 20, 2008 incident** in your opinion?

A. **I don't think it is**. She had neck and left arm pain for many years; and I didn't see where there was a change precipitated by the 3/20/08 event.

Q. What other diagnoses did you have, Doctor?

A. Clinically by exam and history she had carpal tunnel syndrome in the left. [sic] She had nocturnal pain and numbness in her hand, and Phalen's test was positive. I didn't have an EMG.

Q. Within a reasonable degree of medical certainty, **is there any causal relationship between that finding and the March 20, 2008 incident** she described?

8

A. **No**.

Q. Any additional diagnoses, Doctor?

A. Yes. She had bilateral knee DJD, right worse then left by examination.

Q. In your opinion, Doctor, **is there any causal relationship between that diagnosis of bilateral degenerative joint disease and the March 20, 2008 incident**?

A. **No**.

R.R. at 90, 91, 94 (emphasis added). Accordingly, finding of fact 25 is supported by substantial evidence.

Claimant asserts that because findings of fact 16, 21 and 25 were allegedly not supported by substantial evidence, the WCJ's decision was not reasoned.

> Section 422(a) of the [Workers' Compensation] Act [(Act)[2]] requires a WCJ to issue a decision that permits an appellate court to exercise adequate appellate review. In order to satisfy this standard, a WCJ does not need to discuss every detail of the evidence in the record. Rather, Section 422(a) of the Act requires WCJs to issue reasoned decisions so that this Court does not have to 'imagine' the reasons why a WCJ finds that the conflicting testimony of one witness was more credible than the testimony of another witness.
>
> Although our Supreme Court has held that a WCJ need not explain credibility determinations relating to a witness who testifies before the WCJ, Section 422(a) of the Act requires some explanation of credibility determinations by a WCJ with regard to conflicting deposition testimony in order to enable this Court to review a WCJ's decision. Under Section 422(a) of the Act, a WCJ must articulate the objective rationale underlying his credibility determinations where the testimony of such witnesses is conflicting. **A WCJ may satisfy the reasoned decision requirement if**

---

[2] Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 834.

**he summarizes the witnesses' testimony 'and adequately explains his credibility determinations**.' *Clear Channel Broad. v. Workers' Comp. Appeal Bd. (Perry),* 938 A.2d 1150, 1157 (Pa.Cmwlth.2007). Thus, while summaries of testimony alone would be insufficient to satisfy the reasoned decision requirement, **where a WCJ summarizes testimony and also objectively explains his credibility determinations, the decision will satisfy the requirement**. Further, other evidence in the record may provide the objective support necessary under Section 422(a) of the Act for adequate credibility determinations.

*Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods),* 37 A.3d 72, 76 (Pa. Cmwlth. 2012) (citations omitted; emphasis added).

Here, the WCJ found Dr. McNeil's testimony "incredible because it is contrary to the credible and persuasive testimony of Dr. Baker." WCJ Dec. at 3, FOF 16. The WCJ deemed Dr. Nasir's testimony "to be incredible because it is contrary to the credible and persuasive testimony of Dr. Baker and it is based upon an inconsistent history." WCJ Dec. at 4, FOF 21. Finally, the WCJ determined that "Dr. Baker's testimony is found to be credible because he performed [a] thorough physical examination and reviewed numerous diagnostic test results and medical records concerning [] Claimant's treatment and his objective findings are consistent with those of the physician's [sic] who examined [] Claimant in close proximity to the incident." WCJ Dec. at 5, FOF 25.

In the instant case, the WCJ summarized Dr. McNeil's, Dr. Nasir's, and Dr. Baker's testimony and adequately explained his credibility determinations. Thus, because the WCJ summarized the testimony and also objectively explained his credibility determinations, the decision satisfies Section 422(a) of the Act. Accordingly, the WCJ issued a reasoned decision.

Because this Court may not reweigh the evidence or the WCJ's credibility determinations, and must view the evidence in a light most favorable to

Employer, we hold that the WCJ did not err in denying the Claim Petition. Accordingly, the Board properly affirmed the WCJ's decision.

For all of the above reasons, the Board's order is affirmed.


_____
ANNE E. COVEY, Judge

11

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Emma Shuder,                 :
             Petitioner     :
                               :
          v.                 :
                               :
Workers' Compensation Appeal    :
Board (Serenity Gardens Assisted   :
Living Community and Liberty      :
Insurance Corporation),         :    No. 350 C.D. 2015
            Respondents   :

## O R D E R

AND NOW, this 30th day of December, 2015, the Workers' Compensation Appeal Board's February 12, 2015 order is affirmed.

_____
ANNE E. COVEY, Judge